**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

SUZGO PHIRI,

          Defendant.

Case No. 22-CR-00122 (CRC)

**DEFENDANT SUZGO PHIRI'S MEMORANDUM IN AID OF SENTENCING**

Defendant Suzgo Phiri respectfully submits this Memorandum in Aid of Sentencing. Mr. Phiri will come before the Court on June 20, 2023 for sentencing after pleading guilty on February 21, 2023 to one count of Conspiracy to Commit Wire Fraud and Bank Fraud in violation of 18 U.S.C. § 1349. For the reasons set forth below, Mr. Phiri respectfully requests that the Court impose a sentence below the guidelines, specifically a sentence of time served, approximately fifteen months.

**INTRODUCTION**

Mr. Phiri repeatedly has accepted full and complete responsibility for his actions. He violated the law and pleaded guilty, making no excuses and pointing a finger at no one else. As the numerous letters submitted to the Court and discussed below from a wide array of friends, family members, and community leaders attest, Mr. Phiri is a kind, hard-working, and compassionate man. A devoted father to his two young daughters, NP (age 8) and EP (age 7)[1], Mr. Phiri has always worked hard to support the people in his life. Mr. Phiri recognizes that his

---

[1] The names of Mr. Phiri's children are anonymized in this Memorandum and in the attached exhibits to protect their privacy.

offense is serious and requires the appropriate attention of this Court.  He acknowledges that his conduct was disgraceful.  However, Mr. Phiri provides this memorandum to request that his sentence be no greater than necessary to achieve the goals of sentencing under 18 U.S. Code section 3553, specifically time served, approximately fifteen months.

Mr. Phiri regrets his actions and has learned from his many mistakes.  He is not a habitual criminal who intended to cause harm to another human being.  Rather, an initial bad decision led to several more when Mr. Phiri was not able to obtain gainful employment to adequately support his family.  Mr. Phiri greatly regrets the actions that led to his current situation and has learned from the experience, using his time in jail thus far to reflect on his conduct.

Mr. Phiri has endured significant hardship, including a tumultuous upbringing that involved the loss of his father at age nine, the survival of an armed robbery, and frequent moves and school changes between Zambia and the United States.  After returning to the United States for college and later becoming an air traffic controller with the Federal Aviation Administration, Mr. Phiri made a wrong decision, leading to legal issues.  The FAA placed him on administrative leave and, after a period of investigation, terminated him.  Mr. Phiri then was unable to find work that could pay him enough to support his family.  Mr. Phiri attempted to earn money for himself as an independent gig worker by renting out cars through an app, attempting to flip houses, driving for Uber, and managing a music artist.  None of those provided enough income to feed his family. Over time, Mr. Phiri found himself in a desperate position and as his marriage dissolved, he gradually fell down the wrong path, resorting to illicit means and making a series of decisions that he acknowledges were wrong as he attempted to provide for his family and loved ones.

In considering his sentence, Mr. Phiri respectfully requests that the Court consider a variety of factors, including but not limited to Mr. Phiri's demonstrated and deep commitment to his

family and community service. The numerous letters submitted to the Court from friends and colleagues attest to Mr. Phiri's many exceptional qualities, his devotion to family, and the important role he plays in his community. Incarcerating Mr. Phiri will continue to hurt his ability to support his daughters, family members, and broader community, and a sentence below the guidelines range can mitigate the harmful impact of his incarceration while still serving the purposes set forth in section 3553.

Mr. Phiri respectfully requests a sentence below the guidelines range—specifically, Mr. Phiri requests a sentence of time served, or approximately fifteen months. The Government has agreed that sentencing on the low end of the applicable guidelines range is appropriate, reflecting Mr. Phiri's full acceptance of responsibility for his conduct. The Probation Officer has recommended a total offense level of 20, which corresponds to a sentence of 37-46 months for Criminal History Category II. Presentence Investigation Report ("PSR") ¶ 39. While Mr. Phiri appreciates the Government's recognition of his acceptance of responsibility, Mr. Phiri respectfully requests that the Court sentence him below the guideline range for the reasons below and considering the attached letters. Such a sentence will allow Mr. Phiri to sooner rebuild his life and return to supporting his daughters, family, and community.

**SENTENCING STATUTORY AND GUIDELINES ANALYSIS**

When determining the appropriate sentence, this Court must weigh factors that include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed, the United States Sentencing Commission guidelines, and the need to avoid unwarranted disparities among similar offenders. 18 U.S.C. § 3553(a); *see generally* U.S. Sent'g Guidelines Manual (U.S. Sent'g Comm'n 2021). The Court must weigh each of these

factors when determining the appropriate sentence with the least amount of imprisonment necessary pursuant to section 3553(a). *Id.*

The Supreme Court has emphasized that the guidelines are merely one of the factors that district courts consider when fashioning a reasonable sentence and that they are not to be weighed more heavily than the other factors. *See Rita v. United States*, 551 U.S. 338, 351 (2007); *Gall v. United States*, 552 U.S. 38, 47 (2007). A sentencing court may not presume that a sentence within the Guidelines range is automatically reasonable or that a sentence within the Guidelines range is more reasonable than a sentence outside of the range. *Gall*, 552 U.S. at 47. Courts have wide discretion to determine an appropriate sentence and must only "treat the Guidelines as the starting point and initial benchmark." *Id.* at 49; *see United States v. Booker*, 543 U.S. 220, 258 (2005) (holding that the g are merely advisory and can only recommend a sentencing range).

Courts must impose the minimum sentence necessary to comply with the purposes of sentencing. When determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, the length of the term, a court "shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is *not an appropriate means of promoting correction and rehabilitation*." 18 U.S.C. § 3582(a) (emphasis added). Rather, courts must "impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes" set forth in section 3553(a) (emphasis added). *Id.*

In addition, district courts should not presume that the Guidelines range for a particular case will always satisfy the section 3553(a) factors because the Guidelines are only "a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350. Rather, district courts have an independent responsibility to ensure that these factors are met and

may depart from a guidelines sentence if it does not satisfy the section 3553(a) factors or if justice warrants a different sentence.  *See id.* at 351.

Considering the factors enumerated in § 3553(a), courts are not required to point to "'extraordinary' circumstances to justify a sentence outside the Guideline range."  *Gall*, 552 U.S. at 47.  A below-guidelines sentence may be appropriate if the Court determines that the guideline sentence "falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines . . . fails to properly reflect § 3553(a) factors."  *Rita*, 551 U.S. at 351.

**I.**     **MR. PHIRI'S PERSONAL HISTORY AND THE NON-VIOLENT NATURE OF THE OFFENSE WEIGH IN FAVOR OF A SENTENCE OF TIME SERVED.**

The Court must consider, among other factors, the nature and circumstances of the offense and the history and characteristics of the defendant.  18 U.S.C. § 3553(a)(1); *Gall*, 552 U.S. at 50 n. 6.  That directive is consistent with the Supreme Court's observation that "the punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 484 (2011) (citing *Williams v. New York*, 337 U.S. 241, 247 (1949)).  Congress codified this principle at 18 U. S. Code section 3661, which states that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct."  *Id.* (citing 18 U.S.C. § 3661).

The non-violent nature of Mr. Phiri's offense and Mr. Phiri's history and personal characteristics strongly support a sentence of time served.  Mr. Phiri experienced a turbulent childhood with frequent moves and cultural adjustments that have impacted his life.  Mr. Phiri makes no excuse for his conduct, but a more complete picture of his turbulent childhood and early adulthood provides context for how he has ended up in his current situation and why he will not re-offend when released.

**A. Numerous hardships and cultural adjustments impacted Mr. Phiri's childhood and adolescence.**

Mr. Phiri endured significant hardship during his tumultuous childhood and many events left a lasting impression on him. Mr. Phiri grew up between the United States and Zambia, with frequent moves that involved navigating cultural differences and new surroundings. *See* T. Phiri Letter, Ex. 3 at 2; Aff. of S. Phiri, Ex. 1 at 1. He attended a new school almost every year and often switched schools during a school year. When Mr. Phiri was nine years old and living in the United States, his father tragically passed away due to a sudden illness. *See* T. Phiri Letter, Ex. 3 at 2. Mr. Phiri returned to Zambia for his father's funeral and became "the man of the house," as Mr. Phiri's older sister notes, and was his younger sister's "protector in every sense of the word." K. Iluyomade Letter, Ex. 4 at 2; C . Thorne Letter, Ex. 5 at 1. From that point on, he had no male role models around for guidance and support and began to "understand the burdens of financial hardship" from observing his mother attempting to support the family on her own. *Id.*; Aff. of S. Phiri, Ex. 1 at 1. When Mr. Phiri fainted at his father's funeral, his grandfather told his younger sister that "He is the man of the house now, he has to be ok." C. Thorne Letter, Ex. 5 at 1. This new role has accompanied Mr. Phiri at every moment since that day and instilled in him a need to provide for others and ensure the wellbeing of his loved ones—especially his mother, two sisters, and two daughters.

In addition to losing his father, Mr. Phiri experienced another traumatic event as a child in Zambia when he was about twelve years old. One night while Mr. Phiri played video games, six armed men with AK-47s suddenly entered his family's home and restaurant. They brutally beat an employee and forced the whole family into the bathroom, threatening to harm and kill Mr. Phiri's family, including his sisters. T. Phiri Letter, Ex. 3 at 2; K. Iluyomade Letter, Ex. 4 at 2.

Mr. Phiri could do nothing to protect his family, and the experience scarred him although the men did not ultimately harm his family before leaving with money and vehicles. T. Phiri Letter, Ex. 3 at 2; K. Iluyomade Letter, Ex. 4 at 2. The experience "added to the pressure Suzgo felt of always trying to protect us as he is the only male in the family." K. Iluyomade Letter, Ex. 4 at 2. Mr. Phiri "took it personally that he had failed us by not protecting us[.]" T. Phiri Letter, Ex. 3 at 2-3 (also describing a 2001 incident where Mr. Phiri viewed it as his responsibility to protect his mother from a stroke and the 2002 eviction that Mr. Phiri blamed on himself). These experiences deeply informed Mr. Phiri's constant efforts over the years to fulfill the role of protector and provider for his family.

### B. Mr. Phiri is a hard-working professional who fell upon difficult times.

A peaceful man with a strong work ethic, Mr. Phiri is far from a career criminal—rather, he is a dedicated father who has consistently worked hard throughout his life to support his family. After returning to the United States from Zambia upon high school graduation, Mr. Phiri enrolled in Prince George's Community College while working as a bank teller at Bank of America. Throughout Mr. Phiri's college years, Mr. Phiri covered half of the rent for the apartment he shared with his older sister and sent money back to Zambia to support their mother and youngest sister. *See* K. Iluyomade Letter, Ex. 4 at 2. Mr. Phiri did everything he could to support his family, even to his own detriment. Mr. Phiri's younger sister notes that throughout college, Mr. Phiri "always held down a job to help at home with the bills and he did so with pride." C. Thorne Letter, Ex. 5 at 2. He began working at the Federal Aviation Administration as an air traffic controller in 2008 and graduated with a bachelor's degree in Aeronautical Science from Embry-Riddle Aeronautical University in 2010. *See* Aff. of S. Phiri, Ex. 1 at 1.

Working as an air traffic controller afforded him opportunities and a significant increase in salary. Mr. Phiri describes the time when he "became a proud air traffic controller in 2008," working primarily at the Andrews Airforce Base in Maryland. Aff. of S. Phiri, Ex. 1 at 1.  Mr. Phiri ensured flight safety and authorized, regulated, and controlled commercial airline flights, specialized military operations, and dignitary movements like Air Force One. *See id.*  He describes this time as one of the happiest in his life, thriving in his career and bonding with his coworkers. *See id.*; *see also* R. Payne Letter, Ex. 8; J. Williams Letter, Ex. 9; D. Gaines Letter, Ex. 18.  His friend and former colleague, Randolph Payne, describes him as "well mannered, caring, polite, and God fearing."  R. Payne Letter, Ex. 8.  Jerlysha Williams, also a former air traffic controller, describes Mr. Phiri as a "cool and laid back guy" who shared Ms. Williams' interest in business and investing.  J. Williams Letter, Ex. 9.  As an air traffic controller, Mr. Phiri was at his happiest and most productive.  He envisioned a lifelong career of government service.  *See* Aff. of S. Phiri, Ex. 1 at 1.

In 2014, this stable life crashed.  One mistake – not an intended criminal action – changed the course of his future.  Devastatingly, Mr. Phiri lost this dream job because of a bank snafu and a misunderstanding just a few months after his first child was born.  The facts are simple and not rooted in criminality: Mr. Phiri unintentionally overdrafted one of his bank accounts by approximately $5,000 because of a bounced check, which led the bank to close his account and report the incident to law enforcement.  *See* Aff. of S. Phiri, Ex. 1 at 1.  Mr. Phiri then found himself charged with a crime.  *Id.*  Mr. Phiri received terrible counsel, who advised him not to fight the charge and instead to put it behind him by pleading guilty to the charge and paying a fine. *See id.*; *see also* Ex. 16, Case Summary and Certified Docket, Case Number 0D00302393, District Court of Maryland for Montgomery County.  The lawyer failed to explain the collateral

consequences of the plea.  *See* Aff. of S. Phiri, Ex. 1 at 1.  Importantly, the lawyer also failed to notify the court when Mr. Phiri's job responsibilities prevented him from attending the sentencing hearing, which resulted in an arrest warrant.  *Id.*  Mr. Phiri was arrested while out-of-state and spent over two weeks in jail before his extradition to Maryland—all due to a mistaken withdrawal from *his own* bank account and his attorney's failure to advise him of the sentencing date.  *See id.* at 2.  His absence caused the FAA to place him on a leave of absence and ultimately to terminate him.  *Id.*

Following the job loss, it became difficult for him to find a comparable job, sending him into a downward spiral that culminated in the use of pre-paid American Express cards to make extra money.  Since the 2014 criminal charges, Mr. Phiri attempted to earn money as an independent gig worker by renting out cars through an app, attempting to flip houses, driving for Uber, and managing a music artist.  *See id.* at 2.  In 2015, he was married and living in Upper Marlboro when his second daughter, EP, was born.  *Id.*  Mr. Phiri was in a desperate position and, as his marriage dissolved, he was living in a hotel, unable to rent an apartment by himself because of the 2014 overdraft conviction.  *See id.*  He gradually fell onto the wrong path and made a series of decisions that he acknowledges were wrong in attempts to provide for his loved ones.  *See id.* In his own words, Mr. Phiri says that "I [] recognize that my situation[,] no matter how dire[,] did not warrant me committing a crime nor did it grant me permission to defraud[] others."  *Id.* at 2. He continues, "I am truly apologetic and I seek to make amends to those that I have hurt."  *Id.*

### C.  Mr. Phiri has a deep commitment to family and community.

Mr. Phiri is not a hardened criminal but rather a loving parent who has consistently worked hard to support his family, including when he fell upon difficult times.  Despite the challenges Mr. Phiri has faced during his life, those who know him have never ceased to see the value that he adds

to their lives.  His family, friends, and former co-workers describe him as kind, caring, loyal, trustworthy, selfless, hardworking, generous, humble, compassionate, considerate, peaceful, helpful, respectful, and devout.[2]  Mr. Phiri has an absolute devotion and unwavering commitment to family, friends, and community.  His continuing commitment to those he cares about strongly weighs in favor of a low sentence.

   *1.*    *Mr. Phiri is a loving and devoted father to two daughters.*

Mr. Phiri puts his daughters first.  A close family friend, Bobi TeNzanga, has observed that "[e]specially as a parent, Suzgo takes everything very seriously to ensure his daughter's happiness, experiences and education are prioritized. He's not the parent that allows his children to see him mad or see him upset.  He's the parent that will always put on a good face in front of his kids to make sure they never have to worry."  B. TeNzanga Letter, Ex.14.

Mr. Phiri speaks with both of his daughters daily. He has always treasured the time spent taking his "children to school everyday as well as spend[ing] more time with them doing homework, giving baths, reading bedtime stories."  Aff. of S. Phiri, Ex. 1 at 2.  Now, both daughters are too young to understand why their father is away and ask why he is dressed in orange when they speak via video chat.  NP and EP have already changed significantly in the fifteen months of Mr. Phiri's incarceration. Mr. Phiri notes that his daughters "have had to split up and are no longer close to each other nor to me.  They both have had to change schools not once but twice in a matter of months causing them to be more withdrawn and reserved. In addition, my oldest, [NP] is still dealing with anxiety and panic attacks due to the fact that she was in the home with me when I was arrested."  Aff. of S. Phiri, Ex. 1 at 2.  Mr. Phiri's greatest wish is to hug his

---

[2] Mr. Phiri's family, friends, and former colleagues have written numerous letters to the Court. *See* Exhibits 2-15; 17-19.

daughters on the outside and watch them grow in person rather than through a screen or visitation window.

Incarceration will particularly continue to harm Mr. Phiri's older daughter, NP, who primarily lived with her father and was present for his arrest. Perhaps more than anything, a sentence of time served will help this little girl, who should not be punished any more. Since NP started school, she lived during the week with Mr. Phiri, who got her ready for school, prepared her meals, dropped her off and picked her up, helped her with her homework, and attended parent-teacher conferences. *See* K. Iluyomade Letter, Ex. 4 at 1. On Fridays, he brought her to her mother's house and picked her up again on Sundays to begin the week. *See id.* NP therefore has an incredibly close bond with her father and video calls with him regularly. *Id.* A close friend, Nya Jenkins, writes, "I remember on several occasions throughout the years I came to know how Mr. Phiri would take his daughter on dinner dates. He always provided for his daughter and made sure she had whatever she needed." N. Jenkins Letter, Ex. 12.

The separation has devastated Mr. Phiri's girls, and those around them including Mr. Phiri's ex-wife and mother of his younger daughter rely on him to help raise the girls to break the "poverty cycle" and become productive, successful young women—his younger daughter currently hopes to one day be a "doctor, an engineer, or an astronaut." *See* B. Ford Letter, Ex. 11 at 1; K. Iluyomade Letter, Ex. 4 at 1-2. They both count the hours until Mr. Phiri is home, especially given this life stage for them. Even from jail, Mr. Phiri has not shied away from his parental duties and the needs of his girls. He has tried to parent in every way possible. Mr. Phiri's older sister, Ms. Iluyomade, notes that he has continued to call both of his daughters every day, checking in on how they are doing and helping with homework. K. Iluyomade Letter, Ex. 4 at 1. He has not retreated but has tried to be as present as possible. It's no substitute for being with

them in person, and he knows the harm his continued incarceration is doing to them, but he is trying his best. *Id.* Just by way of example, in December, Mr. Phiri contacted a nonprofit group called Voices for a Second Chance and arranged for them to provide Christmas gifts to his daughters on his behalf. *Id.* Still, Mr. Phiri's return would "greatly assist financially, emotionally, mentally and physically." B. Ford Letter, Ex. 11 at 2.

Both of Mr. Phiri's girls are further faced with the prospect of their father being incarcerated during a particularly critical period of their social and academic development. As they approach their pre-teen years, his two daughters are at crucial educational and social-emotional moments. *See* B. Ford Letter, Ex. 11 at 1. The longer Mr. Phiri is incarcerated, the greater the detrimental effect his absence will have on the girls. *See id.* Research shows that "parental incarceration can have lasting deleterious consequences, especially as children grow older, because effects appear to be stronger for adolescents and young adults than for young children." Julie Poehlmann-Tynan & Kristin Turney, *A Developmental Perspective on Children with Incarcerated Parents*, 15 SOC'Y FOR RSCH. IN CHILD DEV. 3, 7 (2021). Studies have demonstrated that losing a father to jail can lead to significant harm and that "experiencing paternal incarceration typically has detrimental implications for child well-being, especially as children grow older." *Id* at 3. Difficulties such as mental health problems or troubles in school can occur in children who have an incarcerated parent and "youth with incarcerated fathers were less likely to complete college than youth whose fathers were never incarcerated." *Id* at 7. Mr. Phiri's incarceration will be increasingly burdensome on his daughters, who both have a strong bond with him. Moreover, their

father's incarceration will continue to be an especially confusing form of separation for NP and EP, as they do not fully understand why their father is away.

       2.      *Mr. Phiri is a considerate and loving friend, committed to supporting those around him.*

Outside of his criminal mistake, Mr. Phiri has otherwise shown himself to be a man of outstanding character. Those who know him consistently praise his efforts to deescalate conflict and lend an ear. Mr. Phiri is "known as the peaceful friend," according to Bobi TeNzanga. B. TeNzanga Letter, Ex. 14. Mr. TeNzanga appreciates that among friends, never engaged in heated debates or arguments, never escalating tensions but rather defusing them. *Id*. For Nya Jenkins, Mr. Phiri was one of the first people to check on her and her family when her brother, also Mr. Phiri's close friend, tragically passed away in December 2020. N. Jenkins Letter, Ex. 12. She describes him as committed to ensuring that her mother and family are "emotionally taken care of always." *Id*. One summer, Ms. Jenkins needed a place to stay while completing an internship. Mr. Phiri and his family opened their home to her, with Mr. Phiri ensuring that she had transportation options and providing encouraging words when times became tough. *Id*. He has often offered the same support to other friends as well. *See, e.g.*, L. Smith Letter, Ex. 6; O. Oke Letter, Ex. 7 at 1.

His younger sister, Chawezi Thorne, knows Mr. Phiri not only as her big brother but also as an attentive father and uncle to his nephews and niece. C. Thorne Letter, Ex. 5 at 2. Mr. Phiri has often visited his sister with NP and EP or taken family trips together. Ms. Thorne emphasizes that when Mr. Phiri knows that a child is struggling with situation, "whether it's the school yard bully, or shy about a recital he will make sure to spend extra time with the child talking it out and tackling the matter in a fun and unique way." *Id*. Mr. Phiri is also a supportive uncle to his older sister's children – their "favorite uncle." K. Iluyomade Letter, Ex. 4 at 3. When Ms. Iluyomade

was undergoing chemotherapy treatments, Mr. Phiri took her to doctor's appointments and help

with the kids, staying as long as necessary. *Id*.; *see* Aff. of S. Phiri, Ex. 1 at 2. Mr. Phiri's character

shines as a supportive friend and brother and a committed uncle to his nieces and nephews.

> 3.      *An active member of the Church, Mr. Phiri displays a strong commitment to his faith, volunteer work, and community activism.*

Mr. Phiri has always had a passion for the community around him and to helping others.

Those who have observed Mr. Phiri describe him as someone with a deep commitment to serving

his community, "from giving to the homeless to giving to charity and providing help at shelters."

O. Oke Letter, Ex. 7. Incarceration will harm those who benefit daily from this care and love.

At his church, Mr. Phiri has been committed to contributing to the community – for him,

it felt good to be involved with toy drives and feeding the homeless—he was "a very big advocate

of reaching out to the poor and saving them in any way possible," according to Pastor Ziba of

Agape World Center Church. S. Ziba Letter, Ex. 19 at 1. Another pastor of Mr. Phiri's church

and the grandfather of his daughter describes him as "very passionate about helping others in

need," having pioneered the "Feed the Homeless" program with other youth in church. N. Chongo

Letter, Ex. 2.[3] As part of this program, the church members would pack lunches and deliver them

to the homeless in Silver Spring, Maryland or in Washington, DC. Mr. Phiri was responsible for

coordinating the food and delivering it. Active in his church community, Mr. Phiri was also

instrumental in creating a youth musical group in church that ministered to the youth and "led

several of their peers to want more of God in their lives." *Id.* He also gave members "rides to

church, housed visiting pastors, and even let a church member and her family stay at this apartment

---

[3] Reverend Chongo's willingness to provide a letter describing his experiences with Mr. Phiri speaks volumes about Mr. Phiri's character. Reverend Chongo's daughter accepted a guilty plea in exchange for her cooperation in this case in November 2020.

for close to a month when they were relocating back-home in 2013." K. Iluyomade Letter, Ex. 4 at 3.

Sentencing Mr. Phiri to additional imprisonment will make it impossible for him to assist these and other programs and will only alienate him from his community. He is a far more valuable member of society outside of prison, where he can contribute, than inside.

## II.    A SENTENCE OF TIME SERVED WOULD APPROPRIATELY REFLECT THE SERIOUSNESS OF MR. PHIRI'S OFFENSE AND PROVIDE A JUST PUNISHMENT.

Another factor that the Court must consider when sentencing is the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A)-(B). The time that Mr. Phiri has already spent incarcerated has already accomplished these goals. Mr. Phiri has acknowledged and taken responsibility for the damage his conduct caused. While Mr. Phiri acknowledges the seriousness of the offense, it was purely economic in nature. A sentence of additional incarceration would not advance any additional aim of sentencing and would deprive his family and the community of Mr. Phiri's invaluable contributions.

Mr. Phiri has fully accepted the wrongfulness of his actions and acknowledges that he has made poor decisions that are wholly inconsistent with his demonstrated character, history, and moral convictions. Mr. Phiri does not minimize or rationalize his actions here. He also realizes that "my financial woes where trivial compared to the emotional heartache that I am currently putting my family through." Aff. of S. Phiri, Ex. 1 at 2. Mr. Phiri's full acceptance of responsibility and deep contrition for his actions weigh in favor of a sentence of time served. As discussed above, Mr. Phiri is a pillar for his two daughters, siblings, mother, friends and community members. A sentence of time served would allow Mr. Phiri to sooner have his life on track and take care of his daughters while pursuing employment. While Mr. Phiri is aware of how

challenging life will be upon his release, he is ready to face the challenge. Mr. Phiri had used the proceeds of his crimes largely to better provide for his family and loved ones. A sentence below the guidelines range may also be appropriate because the loss table amounts are not indicative of culpability or seriousness of the offense. Courts have explained that "the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004).

### III. A SENTENCE OF TIME SERVED WILL HAVE A DETERRENT EFFECT ON MR. PHIRI AND WOULD NOT CREATE UNWARRANTED SENTENCE DISPARITIES.

This Court must also consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct . . . [and] to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(B)-(C), as well as "[t]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Here, a sentence of time served is necessary to prevent sentencing disparities among similarly situated defendants and will provide a deterrent effect for Mr. Phiri in the future.

#### A. Preventing Sentencing Disparities

The United States Sentencing Commission maintains statistics related to sentencing for theft, property destruction and fraud. In the period analyzed, 40.2% of those convicted of such crimes received a variance from the guideline range, and, of those, 94% of offenders received a downward variance and the average sentence was 21 months. *See Quick Facts: Theft, Property Destruction, and Fraud Offenses Fiscal Year 2020*, UNITED STATES SENT'G COMM'N (2021), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY20.pdf. These data show that variations from the guidelines are hardly uncommon. The plea agreement reserves Mr. Phiri's right to seek a sentence below the guidelines range based on section 3553(a) factors. ECF No. 28 at 5. As indicated above,

those factors weigh strongly in favor of granting Mr. Phiri a sentence below the applicable guidelines range as is common—specifically time served, or fifteen months—in this case.

## B. Deterrence

Mr. Phiri's time incarcerated has already had a strong deterrent effect on him. He has already served a significant amount of time away from his family, having missed birthdays and other life events, and the experience has had a sobering effect on him. Mr. Phiri's mother explains that these past fifteen months "have been an eye-opening, sobering dose of reality and a great lesson to him that has taught him beyond anything else that he needs to straighten out his life and return to the values and principles that had been instilled in him since he was born." T. Phiri Letter, Ex. 3 at 1. She continues that "[h]e has lost friends, his reputation and the high esteem that people held in him." *Id.* Mr. Phiri need not lose anything else. Strongly committed to being a positive force for his family and community, Mr. Phiri is genuinely remorseful, determined to reenter society and make an example of himself so that others in his community can learn from his mistakes. He wishes to " come out on the other side of this a better human being." Aff. of S. Phiri, Ex. 1 at 3.

Research further supports that a sentence of time served—fifteen months—has had and will continue to have a deterrent effect on Mr. Phiri. An additional five or more months will not serve deterrent interests, but rather will just further hurt his daughters. As the Second Circuit noted, a defendant who has previously been sentenced to minimal incarceration might very well be deterred by a lesser amount of incarceration than someone who has shown themselves to be undeterred by a lengthy sentence. *See United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001). Research demonstrates that although the certainty of being caught and punished has a deterrent effect, any "increases in severity of punishments do not yield significant (if any) marginal deterrent

effects."  Michael Tony, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006); *see* Ziv D. Gabby, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-48 (2007) ("Certainty of punishment is empirically known to be a far better deterrent than its severity.").  Research regarding white collar offenders found no difference in the deterrent effect of probation and that of imprisonment.  *See* David Weisberg et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995); *see also* Gabby, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").  Mr. Phiri states that he has already experienced "more violence, more drugs and drug abuse, more corruption, more abuse[,] physical and sexual[,] then [sic] at any point in my life."  Aff. of S. Phiri, Ex. 1 at 2.  This experience has already more than deterred him from any future criminal conduct.

Lengthier prison sentences also do not prevent recidivism.  "[H]aving pulled together the best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions."  Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 PRISON J. 48S, 50S-51S (2011).  "Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society."  Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment*, SENT'G PROJECT, Nov. 2010, at 7.

## IV.    OTHER FACTORS WEIGH IN FAVOR OF A SENTENCE OF TIME SERVED

### A.    Mr. Phiri's criminal history score overrepresents the seriousness of his past conduct.

If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history and likelihood that the defendant will commit other crimes, mitigation of the defendant's criminal history is warranted. U.S.S.G. § 4A1.3.  "[S]ection 4A1.3 manifests the Commission's view that a sentencing judge *should* exercise discretion whenever the judge concludes that the consequences of the mathematical prior-history calculation, prescribed by sections 4A1.1 and 4A1.2, either underrepresent or overrepresent the seriousness of a defendant's prior record." *United States v. Rivers*, 50 F.3d 1126, 1131 (2d Cir. 1995) (emphasis added).

While the Sentencing Commission has not provided a list of the factors the Court should consider in determining whether to grant a downward departure under § 4A1.3(b)(1), there are several factors that the district courts routinely consider.  *See United States v. Hammond*, 240 F. Supp. 2d 872, 880 (E.D. Wis. 2003).  Courts routinely consider factors like the nature of the prior criminal conduct, *see, e.g.*, *United States v. Foreman*, 436 F.3d 638 (6th Cir. 2006), the defendant's record in the context of his life and background, *United States v. Wilkerson*, 183 F. Supp. 2d 273, 380 (D. Mass. 2002), and the length of the prior sentences, *Wilkerson*, 183 F. Supp. 2d at 381.

As described in detail in Section I.B, *supra*, Mr. Phiri's first offense was essentially a misunderstanding regarding a bounced check between his own accounts and poor counsel that caused his life to unravel.  Without that first offense, he would likely still work for the FAA today and would not have resorted to the illicit means that he did, and that he knows were wrong.  Before

his present incarceration, Mr. Phiri never served a sentence longer than ten days.[4]  *See* PSR ¶¶ 46-53.  This is not the criminal history of a hardened criminal who requires a heightened sentence, but rather a man who went down the wrong path in order to provide for his family during a limited period in his life.

### B.    Mr. Phiri has health issues that have gone untreated while in jail.

Further, section 3553(a)(2)(D) requires the court to consider the impact a sentence would have on the ability "to provide the defendant with needed . . . medical care . . . in the most effective manner."  Mr. Phiri suffers from sleep apnea and the D.C. Central Detention Facility has failed to provide him with the required medical care to manage his condition, including by failing to provide a CPAP machine that Mr Phiri and his counsel have repeatedly requested.  *See* Aff. of S. Phiri, Ex. 1 at 2.  As a result, he now suffers from high blood pressure, which will affect his health for the rest of his life.  Further, he has been exposed to tuberculosis while incarcerated and now has a Latent Tuberculosis Infection, meaning that he has a dormant infection that could become active if he does not receive constant treatment.  *Id.*; *see* "Latent TB Infection and TB Disease," CTRS. FOR DISEASE CONTROL AND PREVENTION (2020), available at https://www.cdc.gov/tb/topic/basics/tbinfectiondisease.htm.  There is no doubt that further incarceration will negatively affect Mr. Phiri's ability to manage and receive treatment for these conditions.

### C.    Mr. Phiri faces financial issues that will only worsen as he remains incarcerated, affecting his daughters' wellbeing.

Mr. Phiri's present financial situation is severely strained.  He has virtually no assets and the Draft Presentence Investigation Report states that "based on his current incarceration status

---

[4] Mr. Phiri is awaiting the conclusion of this case before turning to the pending charges, which he expects to resolve.

and lack of income, it does not appear Mr. Phiri has the ability to pay a fine in this case." PSR ¶ 89. He has two school-aged daughters who depend on him. His finances have been strained since the FAA placed him on administrative leave—although he ultimately turned to illicit means to support his family prior to his current incarceration, he is determined not to put his family through this experience again. *See* Aff. of S. Phiri, Ex. 1 at 2. Mr. Phiri will need time and support to get his feet under him upon his release and serving additional time in prison will only further hinder his ability to restart his life. While Mr. Phiri is fortunate to have a strong support system that will help him to find his footing upon release, he is realistic that it will take time to re-establish himself on the outside. *See* B. Ford Letter, Ex. 11 at 3 ("Initially, his village (Mother, Sister, and [his ex-wife]) will provide shared shelter and financial assistance for necessities until empployed."). Based on his financial situation and long history of community service, Mr. Phiri respectfully asks the Court not to impose any applicable fine under the Guidelines.

Moreover, while restitution is appropriate, any significant restitution that strips away the meager support he has saved for his family will be unduly harsh. In no way taking away from the seriousness of the criminal conduct, the identity of the specific victim and what loss they might have suffered are unclear. *See* PSR ¶ 24. While restitution will have virtually no effect on a financial institution, it will lead to harsh and enduring consequences for his children. More than minimal restitution will make them the victims, which ideally should be avoided. In recognition of the appropriateness of restitution for his actions, Mr. Phiri has already agreed to hand over his only existing assets, the balances of his 401K account and life insurance policy.[5]

---

[5] The government and the defense have been in continuous contact regarding restitution. Mr. Phiri has remained committed to cooperating notwithstanding the practical complications presented by his incarceration.

**V.    THE APPROXIMATE SENTENCING RANGE AND THE ADVISORY NATURE OF THE GUIDELINES ALLOW FOR A SENTENCE BELOW THE ESTIMATED GUIDELINES RANGE.**

The Draft Presentence Investigation Report and plea agreement recommend sentences between 37 and 46 months even without accounting for the information contained herein.  The United States Probation Office concluded that the appropriate Adjusted Offense Level in this case is 20 and that Mr. Phiri's Criminal History Category is II, resulting in an advisory sentencing range for imprisonment of 37 to 46 months.  *See* PSR ¶ 91.  Mr. Phiri and the Government further agreed that Mr. Phiri "reserves the right to seek a sentence below the Estimated Guidelines Range based on factors to be considered in imposing a sentence pursuant to § 3553(a)."  ECF No. 28 at 5.  Further, as described above, Mr. Phiri's Criminal History Category overrepresents the seriousness of his past conduct.

Mr. Phiri does not dispute any other aspect of the United States Probation Office's calculation of the guideline range in this case; however, Mr. Phiri submits that the Court should accord minimal deference to the advisory guideline range and instead, the Court should impose a sentence of time served.  A sentence of time served, or fifteen months, is not precluded by any statute or by the sentencing guidelines. The requested sentence would be consistent with Congress' directive that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious offenders who pose the most dangerous threat to society."  18 U.S.C. § 3551.  Mr. Phiri does not pose a threat to society and is a low-priority offender.  He should receive a sentence of fifteen months.

## CONCLUSION

For the reasons stated above, the most appropriate sentence for Mr. Phiri is fifteen months, or time served.  Mr. Phiri does not deny the seriousness of the crime to which he pleaded guilty.

He has taken responsibility and is deeply sorry for his actions and the harm caused by them, and for the pain that he has forced his family to endure.  As the Court determines an appropriate sentence, Mr. Phiri respectfully requests that the Court consider a variety of factors, including, but not limited to, Mr. Phiri's commitment to his family, faith, and community.  Mr. Phiri respectfully submits that the Court impose a sentence of time served.  Such a sentence is reasonable and sufficient to serve the criteria set forth in section 3553.

Respectfully submitted,

/s/ Joshua Berman
Joshua Berman
DC Bar No. 489751
*Pro Bono* Counsel for Defendant
Clifford Chance US LLP
2001 K Street NW
Washington, DC 20006
Tel: (202) 912-5174
joshua.berman@cliffordchance.com

/s/ Mary Elizabeth Bultemeier
Mary Elizabeth Bultemeier
DC Bar No. 1724887
*Pro Bono* Counsel for Defendant
Clifford Chance US LLP
2001 K Street NW
Washington, DC 20006
Tel: (202) 912-5079
maryelizabeth.bultemeier@cliffordchance.com

DATED: June 13, 2023