**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-00122-CRC** |
| | : | |
| **SUZGO PHIRI,** | : | **Sentencing: June 20, 2023** |
| | : | |
| **(a/k/a "Malcolm Tucker,"** | : | |
| **"David Campbell," "Eric** | : | |
| **Brooks," "John Sanders,"** | : | |
| **"Jamal Brooks," "Brady Jones,"** | : | |
| **and "Payton Deel")** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in support of its sentencing recommendation in this case. The government requests that the Court sentence the defendant to a 57-month period of incarceration which is at the bottom of the Guideline range. Such a sentence is warranted in light of the sentencing factors outlined in 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

The parties in this case have reserved "the right to describe fully, both orally and in writing, to the sentencing judge, the nature and seriousness of [the defendant's] misconduct, including any misconduct not described in the charges to which [the defendant] is pleading guilty[.]" (ECF No. 28 at 5.) As discussed further below, the defendant's misconduct involves the use of numerous alias identities to deceive financial institutions. He also used those aliases to secure high-end apartments and luxury vehicles for which the defendant never paid.

<u>The Defendant's Schemes</u>

The charging documents in this case describes no less than eight different schemes that the defendant orchestrated involving the use of false identities and aliases so that the defendant could enrich himself to the detriment of others.  The most sophisticated of these schemes—to which the defendant has entered a guilty plea—involved sham transactions that exploited the float that results when a consumer adds a tip amount to a credit card transaction using a Square reader.  The defendant used multiple false identities to execute that scheme.  But the defendant also used those same false identities to commit other crimes that allowed the defendant to have residences and vehicles without paying for them.

A.    <u>The Sham Transaction Scheme</u>

When a consumer buys something from a merchant and swipes their credit card at a Square card reader, the Square platform gives the consumer the option to add a tip amount. Square debits the purchase amount immediately against the consumer's card and credits the merchant's Square account; Square also credits the tip amount to the merchant, but does not reconcile the tip amount until a later time creating a float—*i.e.*, non-existent funds—in the merchant's Square account that the merchant can instantly remove to a linked bank account.

Since at least 2018 and continuing until the time of the defendant's arrest last year, the defendant generated thousands of dollars every week through a scheme that exploited this weakness.  (Aff.[1] ¶¶ 5-9; Indict. ¶¶ 7-8.)  In order to execute such a scheme, the defendant had to purchase Square credit card readers[2] and set up Square accounts in the names of other people

---

[1] "Aff. ¶ _" refers to the affidavit of Special Agent Christopher Pepper in support of the arrest warrant issued by the Court at the stated paragraph number.  (ECF No. 1-1.)  "Indict. ¶ _" refers to the Indictment at the stated paragraph number.  (ECF No. 6.)

[2] Square readers can be purchased for as little as ten dollars from an office supply store.  *See*, *e.g.*, https://www.staples.com/Square-A-SKU-0047-Credit-Card-Reader/product_572567 (accessed June 13, 2023).

using their personal identifying information ("PII").[3]  (PSR ¶ 18.)   The defendant created at least 34 Square accounts under the following false identities, some of which used the actual PII of real people: "Aaron Brooks," "Eric Brooks," "David Campbell," "Brady Jones," "John Sanders," "Payton Deel," and "Malcolm Tucker."[4]  (PSR ¶ 18.)   The defendant then opened numerous bank accounts at financial institutions that could be linked to those Square accounts.[5]

The defendant and his conspirators purchased numerous American Express Serve (prepaid) credit cards with a stored value, for example, of $20.[6]  (PSR ¶ 19.)   They then used those cards to "swipe" the Square readers with numerous sham transactions—more than 65,000 card swipes—in which no goods or services were exchanged for a nominal amount, often only one dollar.  (PSR ¶ 19.)   They would then add a disproportionately large tip amount to the transaction (for example, five dollars) which Square would instantly credit in full to the defendant's alias Square accounts without deducting the tip from the prepaid card.  (PSR ¶ 19.) The defendant then moved fraudulent "tip" amounts that were instantly credited by Square to bank accounts that he had opened using false identities and then quickly withdrew those funds before the fraud could be detected.  (Aff. ¶ 5(f); Indict. ¶ 7.)

The government has identified at least $430,000 worth of these sham "purchases" and "tips" from the 34 Square accounts controlled by the defendant.  (ECF No. 28 at 8.)  Based on the government's investigation, these losses were born entirely by American Express pursuant to

---

[3] Square accounts can be created online at no cost and can be linked to a Square card reader.  *See* https://squareup.com/us/en/point-of-sale/retail (accessed June 13, 2023).

[4] According to the Social Security Administration, the PII used by the defendant for "David Campbell," "Brady Jones," "John Saunders," "Payton Deel," and "Malcolm Tucker" belong to real people.  (Aff. ¶ 16.)

[5] Square's records provided during the government's investigation identify no less than 54 unique bank accounts linked to the defendant's Square accounts.

[6] A forensic accountant with the government has analyzed the records provided by Square during this investigation and found that 3,302 unique cards were used in the defendant's scheme.

various indemnification arrangements among the financial institutions impacted by the defendant's scheme.

The defendant did not act alone in executing this sham transaction scheme. In fact, the defendant "manipulated" his child's mother, W-1, into assisting in the scheme. (Ex. 1.) The defendant promised to pay $500 to W-1 for each time that W-1 assisted the defendant in his scheme, although W-1 "always received less than the $500 promised." (Ex. 1.) W-1 met with the defendant "not more than 30 times" to assist in the scheme. (Ex. 1.) The defendant "would bring up to 20 gift cards each time they met" and the defendant told her the scheme was legitimate. (Ex. 1.) Over time, the defendant stopped paying W-1 in cash and gave her an ATM card in the name of an alias that W-1 could use. (Ex. 2.) The defendant ultimately ended this "business arrangement" with W-1 because W-1 had been "consistently tardy" to their meetings. (Ex. 2.) And, according to W-1, the defendant admitted that two other individuals—another girlfriend and a relative—both assisted the defendant with the scheme. (Ex. 2.)

B.      Other Fraud with the Same Aliases

The defendant also used his fraudulent personas to enjoy a lavish lifestyle at no cost. As demonstrated in the charging documents, the defendant used his fake identities to lease four different residences and three different vehicles. The defendant never paid in full as required by the leases and contracts and, consequently, caused losses to all of the companies he had agreed to pay.

In April 2018, he used the false identity "Malcolm Tucker" to lease an Infinity MPV from Enterprise Rent-A-Car that the defendant never returned for eight months causing a loss of $19,510. (Aff. ¶ 11; Indict. ¶¶ 21, 25-26). In May 2018, the defendant used the false identity "Malcolm Tucker" to lease two apartments located at 710 Roeder Road, Silver Spring,

4

Maryland,[7] and at 28 K Street SE, Washington, D.C.    Both of those addresses are high-rise luxury apartment buildings. "Malcom Tucker" never paid the monthly rent in full for 710 Roeder Road and was evicted by the landlord in December 2018 causing a loss of $15,000. (Aff. ¶ 12; Indict. ¶¶ 14, 19, 22-23.)  "Malcolm Tucker" also never paid the monthly rent for the apartment at 28 K Street SE and was evicted in March 2019 causing a loss of $35,167.[8]  (Aff. ¶ 14; Indict. ¶¶ 19, 23, 27.)  "Malcom Tucker" furnished the apartment at 28 K Street SE with furniture leased from a staging company that "Tucker" never paid for causing an additional loss of $7,300. (Aff. ¶ 15.)

In February 2020, the defendant used the alias "Eric Brooks" to lease an apartment at 8250 Georgia Avenue, Silver Spring, Maryland—another high-rise apartment building.  (Aff. ¶ 18).  "Eric Brooks" never paid for that apartment and, in October 2021, the landlord evicted him.  (Aff. ¶ 18.)  The unpaid rent and associated fees caused losses to the landlord of more than $30,000.  (Aff. ¶ 15.)  But just before the defendant was evicted from that apartment, "Eric Brooks" leased another residence at 705 River Mist Drive, Oxon Hill, Maryland.  (Aff. ¶ 19; Indict. ¶ 39.)  The defendant failed to pay rent for that property—$4,100 per month—and the landlord intended to pursue eviction prior to the defendant's arrest in this case.  (Aff. ¶ 19.)

From January 2020 until February 2021, the defendant also used the false identity "Eric Brooks" to join a car subscription service which provided him with a Tesla Model X SUV that the defendant never returned.  (Aff. ¶ 22; Indict. ¶¶ 36-37.)  In joining, the defendant provided a fake Maryland driver's license in the name of "Eric Brooks" with his own picture.  (Aff. ¶ 22.) The defendant used vehicles provided by that service until February 2021 when the defendant

---

[7] The defendant used a fake Social Security Card and a fake South Carolina driver's license to lease the apartment at 710 Roeder Road.  (Aff. ¶ 12.)

[8] In applying for the apartment at 28 K Street SE, "Malcolm Tucker" provided a fake Form W-2 that showed annual wages of $217,000 from his work as a "Web Development/IT Specialist."

crashed one of the service's vehicles causing a total loss to the service and left the scene of the accident.  (Aff. ¶ 22.)

Finally, in June 2021, the defendant used the identifying information of his ex-wife, B.P., to join a car subscription service.  (Aff. ¶ 22; Indict. ¶¶ 44-47.)  The defendant used another one of the subscription service's Tesla vehicles without paying the required monthly subscription fee until the company reported the vehicle stolen in December 2021.  (Aff. ¶ 21; Indict. ¶ 46.)

### Guilty Plea

The defendant entered a guilty plea earlier this year to Count One of the indictment which charges Conspiracy to Commit Wire Fraud and Bank Fraud in violation of 18 U.S.C. § 1349, *i.e.*, the sham transaction scheme discussed above.  (ECF No. 28 at 1-2.)  The government has agreed to dismiss the twelve remaining counts in the indictment at the time of sentencing, although the defendant agreed "that the charges to be dismissed at the time of sentencing were based in fact."  (ECF No. 28 at 2.)

The defendant has also agreed to the "entry of a forfeiture money judgment against the defendant equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to the offense alleged in Count One."  (ECF. No. 28 at 9.)  In accord with that provision, the defendant agreed "to take all steps as requested by the Government to obtain from any other parties by any lawful means any records of assets owned at any time" by the defendant.  (ECF No. 28 at 9-10.)

Another provision in the plea agreement required the defendant "to disclose fully all assets in which [he] has any interest or over which [he] exercises control, directly or indirectly." (ECF No. 28 at 8.)  The defendant agreed to submit a financial statement on a standard financial disclosure form to the Financial Litigation Unit of the United States Attorney's Office at least 30

days prior to sentencing and "if there are any follow-up questions, [he] agree[d] to cooperate with the Financial Litigation Unit" in resolving those concerns.  (ECF No. 28 at 8.)

<div align="center">Defendant's Assets</div>

The scheme that the defendant and his co-conspirators perpetrated against American Express involved more than 65,000 card swipes; 34 different Square accounts registered with the defendant's aliases; and 54 unique bank accounts with financial institutions opened by the defendant.  In total, the defendant obtained or attempted to obtain at least $430,596 through the execution of the scheme.  (ECF No. 29 at 3.)

In his interview with the Probation Office, the defendant "reported no bank accounts or cryptocurrency accounts, nor any real property."  (PSR ¶ 84.)  The defendant also told the probation office that "he has a retirement account" and that "he had a life insurance policy[.]" (PSR ¶ 84.)  However, the defendant "was unable to provide documentation of his finances due to his incarceration status at the time of the interview."  (PSR ¶ 83.)

On May 23, 2023, the Financial Litigation Unit received the defendant's financial statement.  (Ex. 3 at 3.)  On June 7, 2023, the government wrote to defense counsel with a list of the deficiencies in the statement; provided the defendant with an opportunity to cure them; and proposed a continuance of sentencing so the questions could be resolved.  (Ex. 3 at 1.)  On June 12, 2023, defense counsel informed the government that the defendant objected to any continuance of the sentencing date for these purposes.[9]

---

[9] Defense counsel has informed the government that the defendant will consent to a writ of garnishment for his retirement account and his insurance policy.  However, as of the time of this filing, the defendant has not executed any of the documentation necessary for such a writ—nor has the Court issued a garnishment order.  The government expects to have the Application for Prejudgment Writ of Garnishment filed with the Court on or before June 20, 2023.

<div align="center">7</div>

## SENTENCING GUILDELINES

Although the U.S. Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005). Thus, at sentencing a court "must first calculate the Guidelines range applicable to the defendant. *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Pursuant to the plea agreement in this matter, the parties have agreed that the following sentencing guidelines should apply:

| § 2B1.1(a)(1) | Base Offense Level | 7 |
| § 2B1.1(b)(1) | Loss Amount: $430,596 | +12 |
| § 2B1.1(b)(10)(C) | Sophisticated means | +2 |
| § 2B1.1(b)(11) | Use of authentication feature | +2 |
| § 3B1.1(c) | Organizer / leader[10] | +2 |

(ECF No. 28 at 2-3.) These guidelines yield a total offense score of 25. In the plea agreement, the government agreed that the defendant should receive a two-point reduction for acceptance of responsibility. (ECF No. 28 at 3.) The defendant has provided the Court with timely notice of his intention to enter a guilty plea, thereby permitting the Court and the government to allocate resources efficiently, which warrants an additional one-point reduction. The resulting offense level is 22. (ECF No. 28 at 3.)

The government submits that an additional two-point upward adjustment for obstructive conduct is appropriate given the defendant's failure to disclose all of the assets he owns or controls to the Probation Office and to the government as required by the plea agreement. U.S.S.G. § 3C1.1. As noted above, the defendant is known to have owned or controlled no less than 54 unique bank accounts with alias identities. In denying the defendant's motion for

---

[10] The Probation Office appears to have concluded (at ¶ 33) that no adjustment for the defendant's role in the offense should apply. However, the Probation Office was not provided with copies of the interview memoranda attached as Exhibits 1 and 2 hereto prior to the PSR being finalized.

release, the Court noted that the defendant had "significant prior international travel and money transfers" and "potential access to funds in a cryptocurrency account." 10/6/22 Order (ECF No. 27) at 2. Nonetheless, the defendant has failed to provide any accounting of those assets in response to queries from the Probation Office and the government. (Ex. 3.) "It is well settled that a defendant's concealment of assets from a probation officer can support an obstruction adjustment under § 3C1.1 because his financial situation is relevant to his ability to pay fines or restitution." *United States v. Manojlovic*, 520 Fed. Appx. 449, 450-51 (7th Cir. 2013) (collecting cases). The resulting offense level is 24.

The government at this time has no reason to dispute the probation office's calculation that the defendant's criminal history score falls in Category II. (PSR ¶ 45.) With an Offense Level of 24 and a Criminal History of Category II, the Guidelines recommend a sentence of 57 to 71 months of incarceration.

## STATUTORY FACTORS

After calculating the applicable Guidelines range, a sentencing court must then consider that range as well as the sentencing factors set forth in 18 U.S.C. § 3553(a) and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). With respect to that section's enumerated factors, of particular relevance here are the "nature and circumstances of the offense," the need for the sentence "to reflect the seriousness of the offense" and provide "just punishment," "the history and characteristics of the defendant," the need "to promote respect for the law," the need to "avoid unwarranted sentence disparities," and the need for the sentence "to afford adequate deterrence to criminal conduct." 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(6), (a)(7).

9

<u>Nature and Circumstances of the Offense, and its Seriousness</u>

The seriousness of the defendant's crime is beyond question. As the defendant has admitted in entering his guilty plea, "PHIRI and his coconspirators made fraudulent transactions using 34 different Square Accounts with a total value of $430,596"; in setting up many of the bogus Square Accounts, the defendant used "PII belonging to actual people who had not given permission"; and "PHIRI and his coconspirators successfully transferred $108,043.64 from Square Accounts to an Alias Account at Wells Fargo in the name of 'Brady Jones'" from which they "dissipated the proceeds of the conspiracy." (ECF No. 29 at 3-4.)

A scam like this one requires extensive planning and sustained deliberate effort. The defendant had to obtain PII for other persons; purchase Square readers; setup fraudulent Square accounts in the names of false personas; and open fraudulent bank accounts using false identities. The defendant and his coconspirators then had to execute the scheme by swiping American Express Serve cards to create more than 65,000 sham transactions that included a disproportionately large tip—a process that undoubtedly required sustained attention for hours on end.

The defendant is also, without question, the organizer and leader of the scheme. The defendant developed and controlled all of the false identities necessary to execute the scheme. (Ex. 4.)[11] The defendant taught W-1 how to swipe "tips" and told W-1 that the scheme was not illegal. (Ex. 1.) It was the defendant who collected the proceeds of the scheme and paid W-1 for helping—often less than he promised to pay. (Ex 1.) The defendant purchased the American Express Serve cards that were used for the scheme. (Ex. 2.) And the defendant eventually stopped including W-1 in the scheme because W-1 had been tardy to their meetings. (Ex. 2.)

---

[11] Exhibit 4 hereto is a spreadsheet recovered during the execution of a search warrant at the defendant's residence on February 1, 2019. For each of the defendant's aliases, the spreadsheet lists the name, date of birth, Social Security number, email, home address, phone number, mother's maiden name, and salary information.

History and Characteristics of the Defendant

The defendant has been blessed with more good fortune than many others who find themselves in the criminal justice system. The defendant had a "normal" childhood and graduated from high school in Riverdale, Maryland. (PSR ¶¶ 67, 79). He then went on to attend Embry-Riddle Aeronautical University located at Joint Base Andrews in Maryland where he earned a bachelor's degree in Aeronautical Science. (PSR ¶ 79.) He worked as an air traffic controller in 2015 earing a salary of $128,000 per year. (PSR ¶ 81.)

Notwithstanding this success, the defendant decided to resign from his position as an air traffic controller to commit fraud against financial institutions. The defendant's motive was simple. Greed. And the defendant found it was easier to scam American Express than it was to earn the money honestly. Indeed, for years the defendant was able to get away with leasing property and vehicles using fake identities so that he would never have to pay for them.

This matter is not the defendant's first contact with the criminal justice system. As noted by the Probation Office, the defendant has prior arrests and convictions for disorderly conduct (PSR ¶¶ 41, 52); felony theft scheme (PSR ¶ 42); obtaining money by false pretenses (PSR ¶ 44); second degree assault (PSR ¶¶ 50, 52); motor vehicle theft (PSR ¶ 53); driving under the influence of alcohol (PSR ¶ 57); and numerous traffic related offenses (PSR ¶¶ 43, 46, 47, 49, 54-56, 58-60). The defendant also has an outstanding unexecuted arrest warrant from the State of Maryland for burglary and malicious destruction of property. (PSR ¶ 61.)

In addition to the fraudulent identity schemes described above, the government has identified numerous other instances in which the defendant has possessed PII, false identification documents, bank records, and bank cards for individuals other than himself. During a traffic stop on November 28, 2018, the defendant possessed such items for "Malcolm Tucker," "John Sanders," "David Campbell," and "Brady Jones." (Aff. ¶ 14.) On February 1, 2019, law

11

enforcement executed a search warrant at the defendant's apartment and found similar evidence. (Aff. ¶ 17.)  During a traffic stop on December 21, 2021, the defendant also possessed bank cards and fake driver's licenses in the names "Eric Brooks" and "Stephan Chongo."  (Aff. ¶ 20.) When Customs and Border Protection stopped the defendant on his entry into the United States on January 11, 2021, the defendant possessed more fake identification documents and credit cards for "Eric Brooks," "Jamaal Brooks," "Aaron Brooks," and "Joseph Phiri."  (Aff. ¶ 24.)  He possessed two Canadian driver's licenses with his own picture.  (Aff. ¶ 24.)  And, in searching a device that the defendant possessed at the time of the CBP stop, law enforcement found five Apple Note documents that collectively contained the personal PII of 672 different people.  (Aff. ¶ 25.)

<p style="text-align:center">Promotion of Respect for the Law,<br>General Deterrence, and Avoiding Disparities</p>

An appropriate sentence must also afford adequate deterrence.  Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B)-(C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).  It is plain from the defendant's conduct—the sustained execution of multiple fraud schemes—that a Guideline sentence for the defendant is necessary to afford specific deterrence and promote respect for the law.

But general deterrence is also necessary. The legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'"  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225 at 76 (1983)); *see also United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of [general] deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to

increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Mueffelman*, 470 F.3d 33, 30 (1st Cir. 2006) (deterrence of white collar crime is "of central concern to Congress").   As the facts in this case show, the defendant's scams were highly lucrative.  A light sentence—in particular, a sentence below the Guideline Range—would send an unfortunate message that individuals who commit sophisticated fraud can avoid the consistent personal accountability that the Sentencing Guidelines were intended to assure.

The government recommends that this defendant be sentenced to a period of incarceration at the bottom of the Guideline Range, *i.e.*, a term of 57 months.  Such a sentence is consistent with other sentences in this District involving sophisticated financial fraud and would not create an unwarranted sentencing disparity.  *See*, *e.g.*, *United States v. Ijomah Oputa*, No. 23-cr-10-TNM (D.D.C. May 19, 2023) (fraud defendant sentenced to 40 months incarceration; $426,000 loss; sentence consistent with Guidelines); *United States v. Celeste Santifer*, No. 22-cr-279-RCL (D.D.C. May 4, 2023) (fraud defendant sentenced to 41 months incarceration; $618,000 loss; sentence consistent with Guidelines); *United States v. Michael Drummond*, No. 21-cr-401-RCL (D.D.C. May 13, 2022) (fraud defendant sentenced to 36 months incarceration; $204,000 loss; sentence above Guidelines); *United States v. Zevi Chaim Mehlman*, No. 18-CR-00014-EGS (D.D.C. Sept. 7, 2018) (fraud defendant sentenced to 51 months incarceration; $668,000 loss; sentence consistent with Guidelines).

<div align="center">

**RESTITUTION AND FORFEITURE**

</div>

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  The Mandatory Victims Restitution Act (codified at 18 U.S.C. § 3663A) requires restitution in certain federal cases.  Here, the plea agreement includes a specific provision stating that mandatory restitution applies and will be determined by the Court

at sentencing.  (ECF No. 28 at 8.)

The victim for purposes of sentencing on the offense of conviction, Count One, is American Express.   (Indict. ¶ 2.)   However, the government submits that determining a comprehensive restitution amount would involve "complex issues of fact related to the case or amount of the victim's losses."  18 U.S.C. § 3664(c)(3).  As discussed above, the defendant used 34 different Square accounts linked to 54 different bank accounts at multiple financial institutions.  The defendant and his coconspirators used thousands of stored value cards which were swiped more than 65,000 times.  In some instances, financial institutions were able to avoid losses by reversing the fraudulent "tip" charges.  In other instances, it is possible that the defendant purchased stored value cards with untainted funds which could be credited against the loss.  It is also possible that the conspirators comingled untainted funds with proceeds of their fraud.  Resolving these factual issues across all 65,000 separate card swipes "would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3664A(c)(1).

Nonetheless, the parties here agree that the defendant and his conspirators "successfully transferred $108,043.64" to an account at Wells Fargo which the defendant controlled and that the defendant had defrauded American Express in obtaining those funds.  (ECF No. 29 at 3.) Accordingly, the government submits that it would be appropriate for the Court to order the defendant to make restitution to American Express in that amount.

The defendant has also agreed to the entry of a forfeiture money judgment.  The "core concept" of forfeiture is that an offender should not be able to benefit from the "ill-gotten gains" of his criminal behavior.  *United States v. Young*, 330 F. Supp.3d 424, 429 (D.D.C. 2018) *citing United States v. Monsanto*, 491 U.S. 600, 616 (1989).   The government submits that an

14

appropriate forfeiture money judgment would be in the same amount as the Court's restitution order, *i.e.*, $108,043.64.

## CONCLUSION

For all of the foregoing reasons, the government submits that an appropriate sentence in this case is for the defendant to serve a period of incarceration of 57 months along with orders of restitution and forfeiture in the amount of $108,043.64.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:  _____
JOHN W. BORCHERT (D.C. Bar No. 472824)
Assistant United States Attorney
Fraud, Public Corruption & Civil Rights Section
601 D Street, NW
Washington, D.C. 20530
(202) 252-7679
John.Borchert@usdoj.gov

</div>

June 13, 2023

CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of June 2023, I served a copy of the foregoing on counsel for the defendant via the Court's ECF system.

JOHN W. BORCHERT
Assistant United States Attorney

16